Catherine BURROUGHS, Plaintiff,

v.

Larry G. MASSANARI, Acting Commissioner of Social Security, Defendant.

Civ.A. No. 1:00–CV–1289–BBM.

United States District Court, N.D. Georgia, Atlanta Division.

June 25, 2001.

Dorine E. Preis, Office of Dorine E. Preis, Marietta, GA, for Plaintiffs.

Lisa D. Cooper, Office of the United States Attorney, Atlanta, GA, for Defendants.

### *ORDER*

MARTIN, District Judge.

This case is before the court on the Report and Recommendation [Doc. No. 16—1] of the Magistrate Judge recommending that the Commissioner's Motion For Entry of Judgment under sentence four of 42 U.S.C. § 405(g) with reversal and remand of the cause to Defendant [Doc. No. 14—1] be granted in part and denied in part, and that the decision of the Commissioner be reversed, and that this action be remanded to the Commissioner for an award of disability benefits. The Commissioner has filed no objections to the Report and Recommendation. After carefully considering the Report and Recommendation of the Magistrate Judge [Doc. No. 16—1], the court receives it with APPROVAL and ADOPTS it as the Order and Judgment of this court. The Commissioner's Motion for Entry of Judgment under sentence four of 42 U.S.C. § 405(g) with reversal and remand of the cause to defendant [Doc. No. 14—1] is hereby GRANTED IN PART AND DENIED IN PART, in accordance with the Report and Recommendation of the Magistrate Judge, and the decision of the Commissioner is hereby REVERSED, with direction that it be REMANDED to the Commissioner for an award of disability benefits, also in accordance with the Report and Recommendation of the Magistrate Judge.

### *ORDER FOR SERVICE OF FINAL REPORT AND RECOMMENDATION*

BRILL, United States Magistrate Judge.

Attached is the report and recommendation of the United States Magistrate Judge made in this action in accordance with 28 U.S.C. § 636(b)(1) and this Court's Local Rules LR 73 and LCrR 58.1. Let the same be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the report and recommendation within ten (10) days of the receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error or errors made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the district court. If no objections are filed, the report and recommendation may be adopted as the opinion and order of the district court and any appellate review of the factual findings will be limited to a plain error review. *United States v. Slay,* 714 F.2d 1093 (11th Cir.1983), *cert. denied,* 464 U.S. 1050, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984).

The clerk is directed to submit the report and recommendation with objections, if any, to the district court after expiration of the above time period.

## FINAL REPORT AND RECOMMENDATION

Plaintiff brings this action pursuant to 42 U.S.C. §§ 405(g) & 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security denying her concurrent applications for Social Security Disability Benefits, Disabled Widow Benefits, and Supplemental Security Income. The Commissioner's Motion for Entry of Judgment Under Sentence Four of 42 U.S.C. § 405(g) with Reversal and Remand of the Cause to Defendant [Doc. 14] is also before the court. For reasons discussed below, the undersigned **RECOMMENDS** that defendant's motion [Doc. 14] be **GRANTED IN PART** and **DENIED IN PART**, that the decision of the Commissioner be **REVERSED**, and that this action be **REMANDED** to the Commissioner **for an award of disability benefits.**

## I. PROCEDURAL HISTORY

### A. Administrative Proceedings

Plaintiff applied for disability benefits on May 21, 1996, alleging an onset date of July 6, 1993. (Tr. 153). Her application was denied initially and on reconsideration. (Tr. 123–26; 129–32). Thereafter, she sought and obtained a hearing before an Administrative Law Judge ("ALJ"), which was held on October 1, 1997. (Tr. 137–38, 46). On November 24, 1997, ALJ Kelly S. Jennings issued an opinion finding that plaintiff suffers from "a severe history of gastrointestinal problems, complaints of back and leg pain attributed to fibromyalgia, right eye blindness and a history of depression," but that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 117–18). Plaintiff requested review of the ALJ's decision by the Appeals Council for the Social Security Administration, (Tr. 7–13), and on May 13, 1998, the Appeals Council remanded the case to the ALJ with instructions to "further evaluate the claimant's mental impairments," to give further consideration to her work limitations, to provide an appropriate rationale for his conclusions, and to "[o]btain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base." (Tr. 148).

Pursuant to these instructions, the ALJ held a second hearing on October 8, 1998, at which a vocational expert ("VE") was present and testified. On October 30, 1998, the ALJ issued a second unfavorable decision finding that neither plaintiff's mental impairment nor her physical impairments prevent her from performing a significant number of jobs available in the national economy. (Tr. 23–34). On November 23, 1998, plaintiff again requested review by the Appeals Council, (Tr. 18), which was denied on March 30, 2000, making the ALJ's decision the final decision of the Commissioner. 20 C.F.R. §§ 404.955, 404.981. Plaintiff has exhausted her administrative remedies, and this case is ripe for judicial review.

### B. District Court Proceedings

On May 18, 2000, plaintiff filed an appeal of the Commissioner's decision in this court and thereafter filed a comprehensive brief supporting her appeal. (Docs. 2, 11). In response, the Commissioner filed a motion seeking remand of this action to the Commissioner for additional proceedings. (Doc. 14). The Commissioner seeks entry of an order requiring the ALJ "to properly discuss, evaluate, and weigh the medical findings and opinions from Plaintiff's treating and examining sources with regard to her physical impairments, including fibromyalgia, as well as her mental impairments." (Doc. 14, Attached Proposed Order at 1). The Commissioner also asks that the ALJ be directed "to articulate a well-supported rationale for his or her findings regarding Plaintiff's residual functional capacity and what work she can perform." (Id. at 1–2).

On March 30, 2001, plaintiff filed a reply and objection to defendant's motion. (Doc. 15). According to plaintiff, the Commissioner's decision should be reversed and the case remanded for an award of benefits. Defendant did not file a response to plaintiff's objection. For reasons discussed below, the undersigned finds that remand for an award of benefits —— as opposed to additional proceedings, as suggested by the Commissioner —— is warranted in this case.

## II. ANALYTICAL FRAMEWORK AND BURDEN OF PROOF

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do her previous work, but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2), (3).

Under the regulations as promulgated by the Commissioner, a five-step sequential analysis must be followed when evaluating a disability claim. 20 C.F.R. § 404.1520(a). The analysis is as follows:

1. The ALJ determines whether the applicant is currently working; if so, the claim is denied.

2. The ALJ determines solely on the basis of the medical evidence whether the claimed impairment is severe, "that is, a magnitude sufficient to limit significantly the individual's physical or mental ability to do the basic work activity"; if not, the claim is denied.

3. The ALJ decides, again, only using medical evidence, whether the impairment equals or exceeds in severity certain impairments described in the impairment listings in the regulations; if it does, the claimant is automatically entitled to disability benefits.

4. The ALJ considers whether the applicant has sufficient "residual functional capacity," defined as what an individual "can still do despite her limitations," to perform past work; if so, the claim is denied.

5. The ALJ decides, on the basis of the claimant's age, education, work experience, and residual functional capacity, whether the applicant can perform any other gainful and substantial work within the economy. It is only during the final stage of the decision-making process that the ALJ is authorized to use the "Grids," that is, the Medical–Vocational Guidelines set out in Appendix 2 to Subpart P of Part 404 of the Commissioner's regulations.

20 C.F.R. § 404.1520.

In this case, the ALJ reached Step 5 of the analysis. He found that plaintiff has not engaged in substantial gainful activity since the alleged disability onset date; that she suffers from "severe" impairments including "gastrointestinal problems, fibromyalgia and depression"; but that she does not have an impairment or combination of impairments that meet or equal a listed impairment. (Tr. 29). The ALJ then determined that, although plaintiff cannot perform her past relevant work, she has the residual functional capacity to perform work available in the national economy. (Tr. 30). In particular, the ALJ found that plaintiff has the residual functional capacity to perform the physical and non-physical requirements of unskilled, light work with some postural limitations and limitations on her ability "to perform detailed and complex tasks." (Tr. 29–30).

The burden of proof in a disability case is divided between the claimant and the Commissioner. The claimant bears the initial burden of establishing the existence of a disabling condition by demonstrating that she is unable to perform her former type of work. *Boyd v. Heckler,* 704 F.2d 1207, 1209 (11th Cir.1983). Once the claimant has met this burden, the burden of production shifts to the Commissioner to show that, considering the claimant's age, education, work experience, and impairment, other jobs exist in the national economy that the claimant can perform. *See id.* The overall burden of persuasion, however, remains with the claimant to prove that she is unable to perform any of the jobs suggested by the Commissioner. *See id.*

### III. *STANDARD OF REVIEW*

This court has the power to enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). This court, however, may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *Barnes v. Sullivan,* 932 F.2d 1356, 1358 (11th Cir.1991). The Commissioner's findings of fact, if supported by substantial evidence, must be accepted as true. *See* 42 U.S.C. § 405(g); *Cornelius v. Sullivan,* 936 F.2d 1143, 1145 (11th Cir.1991).

"Substantial evidence" means such "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *MacGregor v. Bowen,* 786 F.2d 1050, 1053 (11th Cir.1986); *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). It may be present even if a preponderance of the evidence weighs in favor of the claimant. *Barnes,* 932 F.2d at 1358.

In contrast to the Commissioner's findings of fact, no presumption of validity attaches to the Commissioner's application of the law. *Lamb v. Bowen,* 847 F.2d 698, 701 (11th Cir.1988). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." *Boyd,* 704 F.2d at 1209. Thus, the Commissioner must "apply the correct law" and, importantly, must also "provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted. . . ." *Keeton v. Department of Health and Human Services,* 21 F.3d 1064, 1066 (11th Cir.1994) (citing *Cornelius v. Sullivan,* 936 F.2d 1143, 1146 (11th Cir.1991)).

### IV. *FACTS*

#### A. *Vocational Factors: Age, Education and Work Experience*

Plaintiff was born on April 29, 1946. (Tr. 153). She was almost 50 years old when she first applied for benefits on May 21, 1996. By the time of the second administrative hearing, plaintiff had reached the age of 52. Under the Commissioner's regulations, a person is considered to be "approaching advanced age" when she is between the ages of 50 and 54, inclusive. 20 C.F.R. § 404.1563(c).

Plaintiff completed the tenth grade, (Tr. 71, 165), and is thus considered to have "limited" education under the Commissioner's regulations. 20 C.F.R. § 404.1564(b)(3). Plaintiff's relevant work for the fifteen-year period prior to her application was as a nurse's aide and as a meat wrapper, both of which are considered unskilled, medium exertional-level jobs. (Tr. 96, 165).

### B. *Summary of Impairments*

**Gastrointestinal disorders:** Plaintiff had two surgeries for bowel resections in 1993. (Tr. 176–184, 280–286). Since then she has been diagnosed as having a gastric ulcer, a pyloric channel ulcer, and mild duodonitis, as well as diverticulitis and bilateral renal calculi. (Tr. 303, 353). As a result, plaintiff has had chronic, recurrent abdominal pain, nausea and diarrhea. (Tr. 175–90; 229–44; 280–89; 300–07; 315–54). Plaintiff testified at the second administrative hearing that she experiences stomach pain and nausea of sufficient severity to prevent her from eating and engaging in activity for several days at a time a couple of times per month. (*See* Tr. 380–81).

**Muscular & Tissue Disorders:** Plaintiff has been diagnosed with fibromyalgia and anserine bursitis (of the knee). (Tr. 272). As a result of the former, plaintiff experiences difficulty sleeping, fatigue, and pain in the elbows, lower back, and hands. (Tr. 206–13; 308–14; *see also* Tr. at 161, 171). Plaintiff testified that, if she sits up for long periods of time, she experiences pain in her back and shoulders. (Tr. 59, 62). She also testified that, as often as twice a week, she experiences pain sufficiently severe to keep her in bed all day. (Tr. 64). The knee problems occur almost daily, except for periods of time after she receives a therapeutic injection, and the pain limits her ability to stand and walk. (Tr. 60–61). Plaintiff testified that some days she can walk around her apartment complex, but that on other days she can walk only to the mailboxes. (Tr. 60–61). She also stated that she cannot concentrate when she is experiencing pain. (Tr. 62, 257).

**Mental Impairments:** A psychologist diagnosed plaintiff as suffering from an adjustment disorder with depressed mood and pain disorders associated with both psychological factors and medical conditions. (Tr. 256). The mental disorder affects plaintiff's ability to concentrate, to adjust to changes, and to complete tasks. (Tr. 258–59; 274).

**Monocular Blindness:** Plaintiff is legally blind in the left eye and has impaired vision in the right eye. (Tr. 63, 244). Plaintiff testified that, even with her glasses on, she cannot read fine print. (Tr. 63).

### C. *Medical Evidence*

In July 1993, plaintiff was admitted to Grady Hospital after she reported experiencing acute abdominal pain to the emergency room staff at Northlake Hospital. (Tr. 176–84). An esophagogastroduodenoscopy performed at Northlake showed "chronic antral gastritis, hiatal hernia, diffuse erosion of the stomach and duodenitis." (Tr. 178). At Grady, a surgical procedure known as a right hemicolectomy [1] was performed, as well as an excision of the terminal ilium. (Tr. 178). Plaintiff remained in the hospital for nine days and was discharged with a bowel inflammation. (Tr. 176).

Two months later, plaintiff again experienced severe abdominal pain and was admitted to Plantation General Hospital on September 12, 1993. (Tr. 286). Adhesions and obstructions of the colon resulting from the prior surgery were found. A small bowel resection was done, as well as lysis of the adhesions. (Tr. 280–84).

Follow-up care was given by her general physician, Jafar Tabatabai, M.D., whose records reflect numerous complaints of abdominal and right lower quadrant ("RLQ") pain. (*See, e.g.*, Tr. 235, 237, 231, 301, 300).

Plaintiff also began to experience lower back pain, and on May 23, 1995, Dr. Tabatabai suggested a referral to a pain clinic. (Tr. 231). In October 1995, after experiencing two or three months of severe pain in her thighs and lower back, plaintiff first saw Dr. Frederick McDuffie, M.D., a rheu-

---

1. "Excision of approximately half the colon." *Dorland's Illustrated Medical Dictionary* at 799 (29th ed.2000).

matologist. (Tr. 219–221). Dr. McDuffie noted that, while plaintiff had normal range of motion in her extremities, a considerable amount of spasm and tenderness existed over the muscles in her lumbar region bilaterally, as well as in the back and buttock. (Tr. 220). Additionally, the doctor found greater trochanter tenderness and mild tenderness of the neck and trapezius muscles. (Tr. 220). Dr. McDuffie diagnosed plaintiff as suffering from "fibromyalgia equivalent localized to the low back and buttock," and also noted a possible psychological component to her illness. (Tr. 221).

Dr. McDuffie initially treated plaintiff with Prednisone, which proved ineffective. (Tr. 217–18). A TENS unit and physical therapy also proved ineffective. (Tr. 211–12). Treatment thereafter consisted primarily of injections into the affected areas, Tolacin for pain, and Klonopin as a sleep aid. (Tr. 206–07, 209, 214, 216, 217). Plaintiff continued to experience pain in the knees ("anserine bursa") and elbows, later also in her hands, as well as intermittent fatigue and difficulty sleeping. (Tr. 206–13; 308–314).

On April 24, 1996, plaintiff was treated at the emergency room of Northlake Hospital after experiencing pain in her right lower quadrant and nausea for two days. (Tr. 203). A barium enema revealed diverticulosis of the large bowel. (Tr. 201). The pain did not permanently resolve, and the following month, on May 26, 1996, plaintiff again visited the emergency room. (Tr. 192–195). Plaintiff was offered Demoral to relieve the pain, which she refused. (Tr. 195).

On June 30, 1997, Dr. W. Baird Hudgins, M.D., performed a consultative physical examination of plaintiff on behalf of the Commissioner. (Tr. 243–52). Dr. Hudgins' specialty is internal medicine. (Tr. 252). Upon examination, Dr. Hudgins found plaintiff to have a full range of motion in her neck, dorsal, and lumbar areas, and in the peripheral joints. He also noted that plaintiff was able to stand on her toes and heels, to tandem walk, and to squat and stoop. (Tr. 244). According to Dr. Hudgins, plaintiff reported "no restriction of motion but mostly diffuse tenderness of the lower back and posterior thighs which caused difficulty with walking, sleeping, resting, climbing or getting up to the bathroom." (Tr. 243). Plaintiff also reported that "[s]he feels quite tired most of the time." (Id.).

In a report, Dr. Hudgins stated that he could find no specific limitations on plaintiff's exertional capacity other than those imposed by her subjective symptoms. (Tr. 244). His diagnoses were myalgia of the lower back and upper extremities, mild systemic arterial hypertension, obesity, and blindness of the right eye. (Tr. 244).

Dr. Hudgins also completed a Medical Assessment of Ability to Do Work–Related Activities (Physical). (Tr. 250–52). He indicated on the form that, in his opinion, plaintiff could lift up to 20 pounds for one-third of an eight-hour day. (Tr. 250). He also stated that plaintiff's ability to stand and walk is affected by her impairments, but did not specify in what way other than to say that she tires easily when walking. (Tr. 250). Dr. Hudgins added that plaintiff could occasionally climb, balance, stoop, crouch, kneel, and crawl, and that she should be restricted from heights, moving machinery, and noise. (Tr. 251–52). He concluded by stating that it is "[v]ery hard to a[ss]ess tenderness of a diffuse nature." (Tr. 252).

In a report prepared by Dr. McDuffie on September 25, 1997, he restated his diagnoses of fibromyalgia, anserine bursitis, and depression. (Tr. 272). He also

opined that plaintiff's subjective complaints regarding knee and back pain, the limitations imposed by pain on her daily activities, and her fatigue were consistent with this diagnosis. (Tr. 272–73). Dr. McDuffie further stated that fatigue and a need for rest periods are very common among patients suffering from fibromyalgia. (Tr. 273). Finally, Dr. McDuffie opined that plaintiff could, at best, perform the exertional demands of jobs in the sedentary category. (Tr. 271). The form completed by Dr. McDuffie defined sedentary work as work entailing "lifting 10 pounds maximum and occasionally lifting or carrying such articles as dockets, ledgers, and small tools." (*Id.*). The definition also stated that "a certain amount of walking and standing" may be necessary for such a job. (*Id.*). Relying on this definition, Dr. McDuffie indicated that plaintiff could perform less than a full range of sedentary work. (*Id.*).

On March 9, 1998, plaintiff again began to complain of severe abdominal pain to Dr. Tabatabai. (Tr. 300). The doctor ordered a barium enema which revealed diverticulitis and bilateral renal calculi. (Tr. 303). Less than two weeks later, plaintiff was admitted to Grady Hospital through the emergency room for chronic abdominal pain and loose bowels. (Tr. 325–27). A CT scan revealed small, non-obstructing renal stones, hiatal hernia and a small cyst on the right kidney. (Tr. 333–35). Later, an upper endoscopy was performed, which showed a gastric ulcer, pyloric channel ulcer, and mild duodonitis. (Tr. 353). In medical statements to the DeKalb County Department of Children and Family Services and the Georgia Department of Human Resources prepared in March 1998, plaintiff's treating physician at Grady reported that plaintiff was unable to work due to intractable pain which could be expected to last for an indefinite period of time. (Tr. 352, 354).

Two months after plaintiff's discharge from Grady Hospital, she was admitted to Northlake Hospital for bilateral pneumonia, from May 5, 1998 to May 11, 1998. (Tr. 291–98). She was also found to have iron-deficiency anemia and hemopositive stools. (Tr. 292). Follow-up for this and for her ulcers was done at Grady, where on May 18, 1998, she was again admitted for unresolved pneumonia and persistent right-lower-quadrant pain. (Tr. 338; 342–43). From July 9, 1998 to July 14, 1998, plaintiff was admitted to Grady Hospital for continued abdominal pain. (Tr. 315–19; 350–51). She was treated with Demoral and Omeperazole (Prilosec). (Tr. 350). The following month, a colonoscopy performed at Grady Medical Clinic revealed multiple diverticula as well as hyperplastic polyps. (Tr. 359).

As to plaintiff's mental impairments, a number of her physicians have noted that she suffers from depression. On November 17, 1994, Dr. Tabatabai noted "anxiety, grief, headache and depress[ion]," and prescribed Effexor. (Tr. 233). Dr. McDuffie also noted and monitored plaintiff's depression. In his initial evaluation, Dr. McDuffie opined that, although plaintiff did not believe that stress or depression had anything to do with her physical symptoms, psychological factors may have more of an impact than she is able to recognize. (Tr. 220–21). Throughout plaintiff's treatment with Dr. McDuffie, he noted symptoms of depression and prescribed various medications. (*See, e.g.*, Tr. 214, 216, 217, 308, 309, 310, 311 and 314). As explained in his report of September 25, 1997, depression, as well as fatigue and insomnia, are symptomatic of fibromyalgia. (Tr. 273).

On November 7, 1997, Dr. McDuffie also reported that plaintiff was experiencing frequent panic attacks. (Tr. 314). He

prescribed Wellbutrin and Xanax. (Tr. 313). Thereafter, these attacks subsided, but recurred after plaintiff's mother died in January 1998. (Tr. 311–13). On May 28, 1998, Dr. McDuffie noted that plaintiff was then experiencing only a few panic attacks, but that she was very depressed. (Tr. 310).

At the request of the Commissioner, a consultative psychological evaluation was conducted by Carla A. Hedeen, Ph.D., on May 23, 1997. (Tr. 253–60). Dr. Hedeen conducted a clinical interview and a mental status exam, and administered the following tests: Wechsler Adult Intelligence Scale, Wide Range Achievement Test, Wechsler Memory Scale — Revised Visual Reproduction Scale. (Tr. 253). According to the test results, plaintiff has a full scale IQ of 84, in the low-average range of intelligence. (Tr. 255–57). The doctor also reported that plaintiff suffers from chronic insomnia, daytime dozing, low energy level, and a "severe decline in functioning when pain increases." (Tr. 257). She added that plaintiff has poor insight into her psychological problems. (Tr. 257).

Dr. Hedeen recommended that plaintiff receive counseling for "difficulties with her chronic pain and depressive symptoms." (Tr. 257). She also recommended that plaintiff be evaluated for possible medical treatment of her depression. (Tr. 257). Dr. Hedeen noted that, with treatment, plaintiff's "[p]rognosis is fair for some symptom reduction." (Tr. 257). Her diagnoses were "adjustment disorder with depressed mood, pain disorder associated with both psychological factors and medical conditions, chronic." (Tr. 256).

With respect to plaintiff's ability to perform work activities, Dr. Hedeen reported the following:

There were problems affecting task completion and other behavior important for the work environment. The impaired concentration and memory functioning reduce [her] ability to follow detailed and more complex instructions. She tends to stay in bed when [her] pain level is severe. Therefore, she would not fulfill job responsibilities or relate to others adequately under this circumstance. Adaptability to changes would likely be impaired.

(Tr. 257). Dr. Hedeen also completed a "Medical Assessment of Ability to Do Work–Related Activities (Mental)." (Tr. 258–60). She opined that plaintiff would have good ability to follow work rules, use judgment, and deal with others, but only poor ability to deal with work stresses and to maintain attention and concentration. (Tr. 258). In support of her conclusions, Dr. Hedeen stated that plaintiff experiences increased pain and lower functioning in response to stress, and that test results demonstrate that she suffers from impaired concentration. (Tr. 258–59).

At the second administrative hearing, plaintiff's counsel questioned a vocational expert ("VE") about plaintiff's ability to work in light of Dr. Hedeen's findings. (Tr. 98–101). The VE indicated that, if accepted as true, the restrictions noted by Dr. Hedeen would prevent plaintiff from working. (Tr. at 100).

A review of plaintiff's medical records was also performed on behalf of the Commissioner by a non-treating, non-examining psychological consultant, Stephen O'Hagan, Ph.D., on June 27, 1997. (Tr. 262–70). According to Dr. O'Hagan, the medical record and the Disability Report completed by plaintiff do not support the severity of the findings reported by Dr. Hedeen. (Tr. 263). He opined that plaintiff has an adjustment disorder and a pain disorder, but no functional limitations, except that she may seldom have deficiencies of concentration. (Tr. 263, 265).

## V. FINDINGS OF THE ADMINISTRATIVE LAW JUDGE

The ALJ found, among other things, that plaintiff's depression does not impose more than a slight limitation on her ability to work, and rejected the opinion of Dr. McDuffie that plaintiff's condition limits her to the physical demands required for less than a full range of sedentary work.

With respect to plaintiff's depression, the ALJ noted that the record contains no indication that plaintiff "receives mental health treatment other than medications prescribed by Dr. McDuffie for depressive symptoms and panic attacks." (Tr. 25). The ALJ then added:

> Dr. McDuffie's office notes reveal resolution of the claimant's panic attacks through appropriate treatment. These notes also show signs of situational depression, resulting from the stress of caring for her ill mother for 2 years prior to death in January 1998; grieving the death of her mother; and subsequent feelings of worthlessness now that her mother has passed. Dr. McDuffie's office notes contain complaints by the claimant of sleep difficulties. However, the claimant's sleep disturbance was related to caring for her mother who required care throughout the night (Exhibit 9F, pg. 5). These records also show reports of improved sleep to the point that the claimant reported rare usage of sleep medication (Exhibit 9F, pg. 8). On June 5, 1997, the claimant reported to Dr. McDuffie that she was not depressed, just tired, adding that she had recently quit walking for exercise (Exhibit 9F, pg. 6). In August 1997, there was evidence of some depression, but "not severe" according to the claimant (Exhibit 9F, pg. 5).

(Tr. 25). The ALJ then concluded that plaintiff's mental impairment does not effect her ability to perform a full range of unskilled work:

> In light of Dr. McDuffie's treatment notes showing situational depression with improvement through prescribed medical therapy; the consulting psychologist's. [Dr. Hedeen's] assessment of June 16, 1997; lack of mental health treatment; and claimant's statements of record indicating the abilities to care for her ill mother for 2 years, cook, clean, shop, attend movies, and visit with her children, grandchildren and friends (Exhibit 1E), I find that the claimant's depression has resulted in· only slight restrictions of activities of daily living and social functioning. The consulting psychologist [Dr. Hedeen] reported poor abilities to sustain concentration, persistence and pace, but reported unlimited abilities to understand, remember and carry out simple job tasks (Exhibit 6F, pp. 6 and 7[}]). Despite this discrepancy, it appears that, while there is evidence that the claimant has low tolerance to stress, she has demonstrated the ability to carry out caregiving tasks, such as those required in her past job as a nurse's aide, under stressful conditions. Accordingly, I find that the claimant retains the mental residual functional capacity to perform unskilled work.

(Tr. 25–26).

The ALJ also rejected the opinion of plaintiff's treating physician, Dr. McDuffie, regarding plaintiff's capacity to perform work-related activities:

> Dr. McDuffie's treatment records do not support his conclusions that the claimant cannot sustain even sedentary work due to severe musculoskeletal pain, ˙fatigue and depression. His reports reflect no objective signs of joint swelling and the claimant's complaints of fatigue and depression obviously resulted from stress and lack of sleep while caring for her mother and grief over her mother's death. By successfully administering caregiving to her ailing mother, the claimant demonstrated that her fibro-

myalgia pain was not incapacitating. Moreover, in light of the fact that the claimant has a daughter and grandson who are disability recipients, the claimant's motives for her claim are questionable.

I do not afford controlling weight to Dr. McDuffie's conclusions in light of his own treatment records which do not support his conclusions. Instead, I afford controlling weight to Dr. Hudgins' assessment which is supported by his physical examination as well as laboratory tests and x-rays.

After considering all of the evidence, I conclude that the claimant retains the exertional and nonexertional residual functional capacity to perform unskilled, light work with the restrictions noted in Dr. Hudgins' assessment . . . .

(Tr. 27–28).

## VI. ANALYSIS

### A. The ALJ failed to provide adequate reasons for rejecting the opinion of Dr. Hedeen regarding plaintiff's mental impairments

▇ The ALJ gave the following reasons for rejecting Dr. Hedeen's opinion: (1) absence of evidence "showing that the claimant receives mental health treatment other than medications prescribed by Dr. McDuffie for depressive symptoms and panic attacks"; (2) evidence that plaintiff's panic attacks have been resolved with appropriate treatment; (3) evidence that plaintiff actually suffers from "situational depression, resulting from the stress of caring for her ill mother for 2 years" and her subsequent death; (4) evidence that plaintiff does not have a problem with sleep; (5) statements made by plaintiff to her doctors that she is not depressed; (6) plaintiff's purported ability to "cook, clean,

shop, attend movies, and visit with her children, grandchildren and friends"; and (7) plaintiff's purported ability to carry out "caregiving tasks" on behalf of her mother, "such as those required in her past job as a nurse's aide, under stressful conditions." (Tr. 25–26). As will be demonstrated below, none of these reasons is supported by substantial evidence.

1. *"Situational Depression," Sleep Difficulties, and Care of Plaintiff's Mother*

In rejecting Dr. Hedeen's opinion, the ALJ opines that plaintiff actually suffers from "situational depression, resulting from the stress of caring for her ill mother for 2 years prior to death in January 1998; grieving the death of her mother; and subsequent feelings of worthlessness now that her mother has passed." (Tr. 25). Elsewhere in his opinion, the ALJ states that plaintiff's "complaints of fatigue and depression obviously resulted from stress and lack of sleep while caring for her mother and grief over her mother's death." (Tr. 27). The ALJ adds that, although plaintiff complained of sleep difficulties to Dr. McDuffie, her "sleep disturbance was related to caring for her mother who required care throughout the night." (Tr. 25). Finally, the ALJ finds that plaintiff has demonstrated good mental functioning by providing care equivalent to that of a nurse's aide to her ailing mother under stressful conditions. (Tr. 26).

The ALJ supports these assertions with a single citation to the medical record, an entry made by Dr. McDuffie in plaintiff's medical chart on August 19, 1997. (*See* Tr. 25, 275). There, Dr. McDuffie wrote, "Not sleeping too well because mother [with] LHF, diabetes, emphysema is up all night & sleeps all day." (Tr. 275).

As plaintiff demonstrates in her brief, the ALJ's finding that plaintiff administered care to her mother is "without any basis in the record," as is his diagnosis of "situational depression" and conclusion that plaintiff's sleep disturbances were caused by her mother's presence. (Doc. 11 at 11–13). Plaintiff reported sleep disturbances for a number of years, including both before and after the time plaintiff's mother lived with her. (*See, e.g.,* Tr. 206–07, 210, 212, 214, 218, 219, 233, 308, 310). The single cited reference to plaintiff's mother in Dr. McDuffie's records provides, at most, evidence that the presence of plaintiff's mother exacerbated an already existing condition.

The ALJ's unsupported assertion that plaintiff was required to care for her ailing mother, either during the night or at other times of the day, is also contradicted by the record. Plaintiff did not mention any such activity in written reports she submitted to the agency, (Tr. 164, 171), or to the consultative psychologist, (Tr. 253–57). Furthermore, the only arguably relevant[2] mention of plaintiff's mother during either administrative hearing occurred during the following exchange:

Q [by attorney] Okay. Do you do any housework?

A [by plaintiff] Well, I'll straighten up. I'll —— my daughter and I'll do it together. I don't —— I can't vacuum or sweep definitely, but I'll dust.

\* \* \* \* \* \*

Q There's somebody —— who else is living in the house now?

A Just my daughter, my grandson and my mom's there.

Q Okay. Why is your mom living with you now?

A Well, all of her kids are up here.

Q Does she help?

A Well, she's sickly but she's not bedridden or anything. But she has a heart condition and she don't do that much. (Tr. 66, 70–71). This evidence does not support a finding that plaintiff provided her mother with any significant care.

Aside from the absence of evidence supporting the ALJ's assertions regarding plaintiff's sleep and care of her mother, the ALJ has inappropriately substituted his opinion that plaintiff suffers from "situational depression" for that of plaintiff's doctors. *See Freeman v. Schweiker,* 681 F.2d 727, 731 (11th Cir.1982) (ALJ may not substitute his opinion for that of a doctor); *Graham v. Bowen,* 786 F.2d 1113, 1115 (11th Cir.1986) (same); *see also Marbury v. Sullivan,* 957 F.2d 837, 840–41 (11th Cir.1992)(Johnson, J., concurring)(finding that an "ALJ sitting as a hearing officer abuses his discretion when he substitutes his own uninformed medical evaluations for those of a claimant's treating physicians"). Dr. Hedeen diagnosed plaintiff as suffering from an adjustment disorder with depressed mood and a pain disorder associated with both psychological factors and medical conditions. (Tr. 256). Plaintiff's treating physician also noted depression as early as July 1994, well before plaintiff's mother began living with her. (Tr. 236; *see also* Tr. 221). "An ALJ may, of course, engage in whatever idle speculations regarding the legitimacy of the claims that come before him *in his private or personal capacity;* however, as a hearing officer he may not arbitrarily substitute his own hunch or intuition for the diagnosis of a medical professional." *Marbury,* 957 F.2d at 840–41 (Johnson, J., concurring).

For all of these reasons, the court finds that substantial evidence in the record does not support a finding that plaintiff's

---

**2.** Plaintiff also mentioned that she had taken a trip to Florida, three years before the first hearing, to visit her mother. (Tr. 70). Since then, plaintiff had not traveled out of state. (*Id.*).

depression was only "situational," that her sleep disturbances were caused by her mother, or that she provided any significant care to her mother.

### 2. *Plaintiff's Activities of Daily Living*

The ALJ also found that plaintiff is able to "cook, clean, shop, attend movies, and visit with her children, grandchildren and friends." (Tr. 26). As plaintiff argues, (Doc. 11 at 14–15), the ALJ's finding in this regard is based on a highly selective review of the record.

In support of this finding, the ALJ cites to information plaintiff provided on a questionnaire she completed when she first applied for benefits in May 1996. There, plaintiff stated that she cooks, cleans, and shops *"when [f]eeling O.K. and don't [h]ave as much pain."* (Tr. 164, emphasis added). She also stated that, although she does not have any hobbies, she goes to movies and visits with children, grandchildren, and friends. (*Id.*). The form did not ask plaintiff — and she did not state — how often she engaged in these activities.

When the ALJ asked plaintiff about her housekeeping activities at the first administrative hearing in October 1997, plaintiff testified that she mainly dusts and that her daughter does most of the chores. (Tr. 66). Plaintiff also stated that she had not been to a movie in over a year. (Tr. 71). At the second hearing held one year later, plaintiff testified that she was no longer doing any housework. (Tr. 84–85). This testimony was corroborated by plaintiff's niece, Cheryl White, who testified that Ms. White performs all housekeeping functions for her aunt, and that plaintiff does nothing but eat breakfast and watch television. (Tr. 93). In light of this specific testimony — which the ALJ did not even discuss in his opinion — general statements made by plaintiff on an intake form do not constitute substantial evidence of her ability to perform work-related functions.

### 3. *Remaining Reasons*

As for the remaining reasons relied on by the ALJ, the fact that plaintiff does not perceive herself as depressed and has not obtained treatment from a mental health specialist is not surprising or indicative of an absence of significant illness in light of Dr. Hedeen's finding that plaintiff has poor insight into her mental condition. Plaintiff's failure to obtain additional treatment could also be due to her obviously low economic status. With respect to plaintiff's panic attacks, the medical record demonstrates that plaintiff's panic attacks, although they have subsided, continue. (Tr. 311–13). Moreover, the ALJ provided no explanation as to why improvement in panic attacks necessarily means that plaintiff's *depression* also improved. Indeed, the medical record is to the contrary. (*See* Tr. 310: Dr. McDuffie's note of May 28, 1998, indicating that plaintiff was experiencing only a few panic attacks, but that she was very depressed).

For these reasons, the court finds that substantial evidence in the record does not support any of the reasons given by the ALJ for rejecting Dr. Hedeen's assessment of plaintiff's mental abilities.

### 4. *Dr. O'Hagan's Opinion*

██ Finally, although not explicitly relied on by the ALJ, the court also finds that the opinion of consultative examiner Dr. O'Hagan regarding plaintiff's mental abilities does not constitute substantial evidence supporting the ALJ's finding. Significantly, Dr. O'Hagan, unlike Dr. Hedeen, did not personally examine plaintiff. He based his opinion entirely on a review of the medical record. The Commission-

er's regulations require that "more weight [be given] to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant]." 20 C.F.R. § 404.1527(d)(1); *accord Broughton v. Heckler,* 776 F.2d 960, 962 (11th Cir.1985); *Swindle v. Sullivan,* 914 F.2d 222, 226 n. 3 (11th Cir.1990). Indeed, the Court of Appeals for the Eleventh Circuit has held that "[t]he opinions of nonexamining, reviewing physicians, ... when contrary to those of the examining physicians, are entitled to little weight, and standing alone do not constitute substantial evidence." *Sharfarz v. Bowen,* 825 F.2d 278, 280 (11th Cir.1987); *accord Spencer on Behalf of Spencer v. Heckler,* 765 F.2d 1090, 1094 (11th Cir.1985) (" '[t]o attempt to evaluate disability without personal examination of the individual and without evaluation of the disability as it relates to the particular person is medical sophistry at best' "); *see also Lamb v. Bowen,* 847 F.2d at 703; *but cf. Edwards v. Sullivan,* 937 F.2d 580, 584–85 (11th Cir.1991) (finding that the ALJ did not err in relying on the opinion of a non-examining physician where the physician's opinion was consistent with the opinions of examining physicians).

B. *The ALJ failed to provide adequate reasons for rejecting the opinion of Dr. McDuffie regarding plaintiff's physical impairments*

■ Under the Commissioners's rules and regulations, the medical opinion of a treating physician *"must* be given controlling weight, *i.e.,* it must be adopted" if it is "well-supported and not inconsistent with the other substantial evidence in the case record." Social Security Ruling 96–2p; *see also* 20 C.F.R. § 404.1527(d)(2)("If we find that a treating source's opinion ... is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

other substantial evidence in your case record, we will give it controlling weight."). The Court of Appeals for the Eleventh Circuit has also repeatedly made clear that the opinion of a treating physician must be given substantial weight unless good cause is shown for its rejection. *See, e.g., Lamb v. Bowen,* 847 F.2d at 703; *Walker v. Bowen,* 826 F.2d 996, 1000 (11th Cir.1987); *Sharfarz v. Bowen,* 825 F.2d at 279–80; *Schnorr v. Bowen,* 816 F.2d 578, 581 (11th Cir.1987); *McSwain v. Bowen,* 814 F.2d 617, 619 (11th Cir.1987); *MacGregor v. Bowen,* 786 F.2d at 1053. The opinion of a consultative examiner, in contrast, is not entitled to any special weight. *McSwain,* 814 F.2d at 619.

■ Good cause exists for an ALJ to reject a treating physician's opinion when it is unsupported by "objective medical evidence or is merely conclusory." *Edwards v. Sullivan,* 937 F.2d at 583 (citing *Schnorr,* 816 F.2d at 582). The ALJ may also reject the opinion of any physician when the evidence supports a contrary conclusion. *Sryock v. Heckler,* 764 F.2d 834, 835 (11th Cir.1985). To ensure that proper weight is accorded, the Commissioner must give "explicit and adequate" reasons for rejecting the opinion of a treating physician. *Elam v. Railroad Retirement Board,* 921 F.2d 1210, 1215 (11th Cir.1991) (ordering payment of benefits after finding that the ALJ failed to provide "explicit and adequate" reasons for discrediting the treating physician's opinion of disability and, thus, accepting that opinion as true).[3]

■ The ALJ provided the following reasons for rejecting Dr. McDuffie's opinion: (1) Dr. McDuffie's "reports reflect no objective signs of joint swelling," (2) plaintiff's "complaints of fatigue and depression obviously resulted from stress and lack of sleep while caring for her mother and grief over her mother's death," (3) plaintiff was

---

**3.** The Eleventh Circuit noted in *Elam* that the "provisions of the Railroad Retirement Act are so closely analogous to those of the Social Security Act that regulations interpreting the latter are applicable to the former." *Elam,* 921 F.2d at 1213.

able to "successfully administer[ ]" caregiving to her ailing mother, thereby "demonstrat[ing] that her fibromyalgia pain was not incapacitating," (4) plaintiff's motives are "questionable" given that she has "a daughter and grandson who are disability recipients"; and (5) Dr. Hudgins' opinion to the contrary. (Tr. 27–28). The second and third reasons are refuted by the discussion above; substantial evidence does not support a finding that plaintiff cared for her mother or that her depression and difficulty sleeping were caused by her mother's presence and/or illness. For reasons discussed below, the remaining reasons offered by the ALJ are also meritless.

### 1. Absence of Joint Swelling

Plaintiff's primary physical impairment, for which she was treated by Dr. McDuffie, is fibromyalgia. "Fibromyalgia is a type of chronic pain syndrome affecting the soft tissues, which may, as cause or effect, involve some sort of psychological disorder or an abnormal response to stress. Typically patients describe deep aching, throbbing, or a burning feeling, and they may feel totally drained of energy." 6 Roscoe N. Gray & Louise J. Gordy, eds., *Attorneys' Textbook of Medicine,* ¶ 25.01 (3rd ed.2000). Apart from muscle and soft tissue pain, both of which are "defining symptom[s]" of the disease, "the most common symptoms, present in more than two-thirds of patients, are undue fatigue, trouble sleeping (insomnia), and joint pains. Slightly less frequent but present in half or more of patients are recurrent headaches, jerky leg movements ('restless legs'), and numbness and tingling in various parts of the body. From one-third to one-half of patients have memory problems, trouble concentrating or leg cramps. About one-third of patients describe 'nervousness,' and one in five have major depression." *Id.,* ¶ 25.35.

Given this description of the disease, the undersigned is unable to discern any relevance to the ALJ's finding that plaintiff did not suffer from joint swelling. As the Court of Appeals for the Seventh Circuit stated in a case involving fibromyalgia, "[s]ince swelling of the joints is not a symptom of fibromyalgia, its absence is no more indicative that the patient's fibromyalgia is not disabling than the absence of headache is an indication that a patient's prostate cancer is not advanced." *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996).

### 2. Plaintiff's Motives

The ALJ attempts to discredit plaintiff by noting that both plaintiff's daughter and her grandson receive disability benefits. (Tr. 28). At the administrative hearing, the ALJ asked plaintiff if her retarded teen-age grandson was on disability, whether her epileptic daughter was on disability, and whether other members of her family were on disability. (Tr. 66–67, 71–72, 88–89).

Social Security claimants are entitled to a hearing that is both full and fair, as well as an individualized disability determination based on evidence adduced at the hearing. *Miles v. Chater,* 84 F.3d 1397, 1400 (11th Cir.1996). Because of the deference accorded ALJ opinions in the review process, the system's integrity depends upon ALJ impartiality. *Id.* at 1401. The ALJ's statement regarding plaintiff's family members is arguably indicative of a bias on his part against plaintiff. Moreover, even if this evidence could be construed as indicative of a lack of credibility, it is far from sufficient, either standing alone or in combination with any other evidence in the record, to discredit plaintiff.

### 3. *Dr. Hudgins' Opinion*

█ Finally, the ALJ points to the opinion of consultative examiner Dr. Hudgins and affords it "controlling weight" because it is "supported by his physical examination as well as laboratory tests and x-rays." (Tr. 28). The laboratory tests and x-rays referred to by the ALJ include a blood test, an electrocardiogram, and a chest x-ray. (Tr. 244–48). The ALJ then concludes that plaintiff "retains the exertional and nonexertional residual functional capacity to perform unskilled, light work with the restrictions noted in Dr. Hudgins' assessment...." (Tr. 28).

The Commissioner's regulations define light work as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling or arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b). Significantly, although Dr. Hudgins stated that plaintiff could lift up to 20 pounds, he expressed reservations about her ability to stand and walk and did not specify how much standing or walking she could do in an eight-hour work day. (Tr. 250). Thus, his opinion, standing alone, does not support the ALJ's finding that plaintiff can perform a limited range of light work. Furthermore, nothing in the tests or x-rays performed by Dr. Hudgins contradicts Dr. McDuffie's opinion that plaintiff, at best, can meet the physical demands of a limited range of sedentary jobs.

Finally, Dr. McDuffie is a specialist in rheumatology and thus better qualified to diagnosis fibromyalgia and to gauge its effects on the individual than Dr. Hudgins, who specializes in internal medicine. *See* 20 C.F.R. § 404.1527(d)(5)("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").

For these reasons, the court finds that the ALJ's reliance on the opinion of Dr. Hudgins is not an adequate ground for rejecting the opinion of plaintiff's treating physician regarding her ability to engaged in work-related activity. "[T]he report of a consulting physician who examined claimant once does not constitute 'substantial evidence' upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician." *Kent v. Sullivan*, 788 F.Supp. 541, 544 (N.D.Ala.1992).

In sum, the court finds that none of the reasons offered by the ALJ for rejecting Dr. McDuffie's opinion regarding plaintiff's ability to engage in work-related activities is supported by substantial evidence when proper legal criteria are applied. Where the Commissioner has "failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true." *MacGregor v. Bowen*, 786 F.2d at 1053. Accordingly, the court finds that plaintiff can, at best, perform physical tasks associated with sedentary work.

### C. *Case should be reversed and remanded for payment of disability benefits, rather than for additional proceedings*

█ In Social Security cases, the role of this court is to determine whether the law has been properly applied and whether substantial evidence supports the Commissioner's findings; it is not to find facts. Because of this limited role, when errors occur, the general rule is to reverse and remand for additional proceedings. *See, e.g., Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir.1993) (referring to general practice); *Holt v. Sullivan*, 921 F.2d 1221, 1223–24 (11th Cir.1991). "This court, how-

ever, may ... remand the case for an ... award[ of] disability benefits where the [Commissioner] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." *Davis*, 985 F.2d at 534; *see also Bowen v. Heckler*, 748 F.2d 629, 636 (11th Cir.1984) (" 'Where the [Commissioner's] determination is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision *with or without remanding the case for a rehearing.*' "); *Carnes v. Sullivan*, 936 F.2d 1215, 1219 (11th Cir.1991) ("The record in this case is fully developed and there is no need to remand for additional evidence."); *Elam*, 921 F.2d at 1216–17 (finding that improperly refuted testimony of a treating physician must be accepted as true and remanding "with directions to enter a finding of total disability"). Thus, a remand for an award of benefits is warranted where "there [is] not substantial evidence on the record as a whole to support the [Commissioner's] denial of benefits." *Bowen*, 748 F.2d at 636.

 The vocational expert testified that, if the opinion of Dr. Hedeen regarding plaintiff's ability to perform work-related activities is accepted as true, plaintiff would not be able to perform any available work. Moreover, given Dr. McDuffie's finding that plaintiff can, at best, perform work-related activities associated with less than a full range of sedentary work, plaintiff qualifies for an automatic finding of disability under the Commissioner's Medi-

cal–Vocational Guidelines ("Grids"). *See* 20 C.F.R., Pt. 404, Subpt. P, App. 2, § 201.09, Table No. 1. The Grids indicate that a person, such as plaintiff, who is closely approaching advanced age, who has a limited education and previous work experience limited to unskilled jobs[4], and who has the ability to perform only sedentary work, is presumptively disabled. (*Id.*).

In short, the evidence in this case overwhelmingly supports a finding that plaintiff is disabled; the record does not contain substantial evidence supporting a contrary finding. This is precisely the type of case where a remand for an award of benefits is warranted.

## VII. CONCLUSION

For the reasons stated, the undersigned **RECOMMENDS** that the Commissioner's Motion for Entry of Judgment Under Sentence Four of 42 U.S.C. § 405(g) with Reversal and Remand of the Cause to Defendant [Doc. 14] be **GRANTED IN PART and DENIED IN PART,** that the decision of the Commissioner be **REVERSED,** and that this action be **REMANDED** to the Commissioner **for an award of disability benefits.** The Clerk of the Court is **DIRECTED** to terminate referral of this action to the undersigned magistrate judge.

---

**4.** The vocational expert testified that plaintiff's previous jobs as a nurse's aide and meat wrapper were unskilled. (Tr. 96).